JACKLIN CHOU LEM (CBN 255293)
CHRISTOPHER J. CARLBERG (CBN 269242)
NOLAN J. MAYTHER (CBN 319471)
Trial Attorneys
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue, Room 10-0101
San Francisco, California 94102-3478
Telephone: (415) 934-5300
Facsimile: (415) 934-5399
jacklin.lem@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA

v.

KENNETH KEYES and
LEROY WEBER,

Defendants.

CASE NO. 2:17-CR-0188-JAM

**GOVERNMENT'S TRIAL BRIEF**

DATE: August 2, 2021
TIME: 9:00 a.m.
COURT: Hon. John A. Mendez

*This brief is identical, in content, to the brief filed at Dkt. 125 (May 3, 2021). This version has simply been corrected for formatting and spacing errors.*

# TABLE OF CONTENTS

I. **TRIAL STATUS AND CHARGES** .......... 1

II. **STATEMENT OF FACTS** .......... 1

- A. Sierra Army Depot .......... 1
- B. Defendant Kenneth Keyes .......... 2
- C. Defendant Leroy Weber .......... 2
- D. Charged Conspiracy to Defraud the U.S. .......... 3

III. **EVIDENCE** .......... 4

- A. Witnesses .......... 4
- B. Documents .......... 5

IV. **SUBSTANTIVE LAW** .......... 6

- A. 18 U.S.C. Section 371 .......... 6
- B. Elements of Conspiracy to Defraud the U.S. .......... 7
- C. Conspiracies to Defraud the U.S. in Its Awarding of Federal Contracts .......... 9

V. **EVIDENTIARY ISSUES** .......... 10

- A. *Bruton* and the Confrontation Clause .......... 10
- B. Jencks Act and Use of Agent Summary Reports .......... 10
- C. Juror Handwriting Comparison .......... 11
- D. Non-Prosecution and Cooperation Agreement .......... 11
- E. Exclusion of Witnesses .......... 12

## TABLE OF AUTHORITIES

### CASES

*Haas v. Henkel*,
216 U.S. 462 (1910) ........ 9

*Hammerschmidt v. United States*,
265 U.S. 182 (1924) ........ 7

*United States v. Alvarez-Farfan*,
338 F.3d 1043 (9th Cir. 2003) ........ 11

*United States v. Anderson*,
532 F.2d 1218 (9th Cir. 1976) ........ 12

*United States v. Blanchet*,
518 F. Appx. 932 (11th Cir. 2013) ........ 9

*United States v. Caldwell*,
989 F.2d 1056 (9th Cir. 1993) ........ 7

*United States v. Conti*,
804 F.3d 977 (9th Cir. 2015) ........ 9

*United States v. Gricco*,
277 F.3d 339 (3d Cir. 2002) ........ 8

*United States v. Halbert*,
640 F.2d 1000 (9th Cir. 1981) ........ 11

*United States v. Jenkins*,
785 F.2d 1387 (9th Cir. 1986) ........ 11

*United States v. Khalife*,
105 F.3d 1300 (6th Cir. 1997) ........ 7

*United States v. Krasovich*,
819 F.2d 253 (9th Cir. 1987) ........ 8

*United States v. Lane*,
765 F.2d 1376 (9th Cir. 1985) ........ 9

*United States v. Little*,
753 F.2d 1420 (9th Cir. 1984) ........ 12

*United States v. Mann*,
161 F.3d 840 (5th Cir. 1998) ........ 8

*United States v. Monroe*,
943 F.2d 1007 (9th Cir. 1991) ........ 12

*United States v. Necoechea*,
986 F.2d 1273 (9th Cir. 1993). .......... 12

*United States v. Peltz*,
433 F.2d 48 (2d Cir. 1970).......... 8

*United States v. Rodman*,
776 F.3d 638 (9th Cir. 2015) .......... 9

*United States v. Rosengarten*,
857 F.2d 76 (2d Cir. 1988).......... 7

*United States v. Shoup*,
608 F.2d 950 (3d Cir. 1979).......... 8, 9

*United States v. Tuohey*,
867 F.2d 534, (9th Cir. 1989) .......... 6

*United States v. Woodson*,
526 F.2d 550 (9th Cir. 1975) .......... 11

**STATUTES**

18 U.S.C. § 3500(e) .......... 10

18 U.S.C. § 371.......... 1, 6, 8, 9

**OTHER AUTHORITIES**

Ninth Circuit Model Criminal Jury Instructions § 8.21. .......... 7

Third Circuit Model Criminal Jury Instructions § 6.18.371B .......... 7

**RULES**

Fed. R. Evid. 404(b).......... 10

Fed. R. Evid. 615 .......... 12

## I. TRIAL STATUS AND CHARGES

Trial in this case begins on Monday, August 2, 2021 at 9:00 am before the Honorable John A. Mendez. At a previous February 2, 2020 trial confirmation hearing, the parties estimated a two-week trial. A trial confirmation hearing is scheduled for June 22, 2021.

On October 19, 2017, a grand jury returned an indictment charging the two defendants—Kenneth Keyes and Leroy Weber—with one count of conspiracy to defraud the United States Department of the Army in violation of 18 U.S.C. § 371. The conspiracy occurred in the Eastern District of California, among other places, and the time period of the charged conduct is at least February 2012 to July 2013.

## II. STATEMENT OF FACTS

Defendants Kenneth Keyes and Leroy Weber conspired to defraud the United States in connection with millions of dollars of government construction contracts at the Sierra Army Depot, a large military storage base. Keyes was a government employee working at the Depot. Weber owned a private construction company called Webco. Keyes deceitfully gave Weber access to—and, indeed, allowed him to create—confidential price estimates the government relied upon to negotiate the Depot construction contracts. Weber, exploiting his access to Keyes and his relationships with prime contractors who were awarded the Depot contracts, steered over $5 million of government money to himself and his companies. In turn, Weber paid Keyes $10,000 and gave Keyes's daughter a $12,000 job. This conspiracy defrauded the United States by obstructing the government's lawful function to award contracts through a fair and honest process and by cheating the government out of money and property.

### A. Sierra Army Depot

The Sierra Army Depot is a large United States Army storage facility in Herlong, California, about a three-hour drive northeast of Sacramento. It stores and refurbishes tanks, weapons, and equipment for all branches of the military. The Depot has hundreds of weapons bunkers, warehouses, and office buildings, and dozens of miles of roads, all of which require ongoing repair and maintenance.

In 2012, the Depot awarded over $25 million in construction projects. These projects included re-roofing warehouses, paving roads, and installing fire sprinklers. The Depot jointly managed the

projects with another federal agency, the General Services Administration ("GSA"). Depot employees—based locally in Herlong, California—identified the construction projects, estimated the costs, and supervised the work. GSA contracting officers—located remotely in Denver, Colorado—negotiated prices with the prime contractors and managed the contracts. The Army paid GSA a 4% fee for GSA's role in negotiating and managing the Depot contracts, a role which included paying the prime contractors using Army funds. The 2012 Depot construction projects were awarded through a sole-source, set-aside contracting mechanism, rather than through a competitive bidding process. Under this sole-source mechanism, the 2012 projects were reserved for firms participating in the federal government's "8(a) program" (which is described more fully below).

**B. Defendant Kenneth Keyes**

In 2012, defendant Kenneth Keyes was a government employee working at the Depot. Keyes was one of the Depot's estimators. As a government estimator, Keyes's job was to identify and survey needed construction projects, conduct market research, use specialized cost and estimating software, and create "Independent Government Estimates" ("IGEs"). IGEs are highly sensitive, confidential documents. They contain the government's estimated prices for a given construction project, and they typically show individual line items for costs such as labor and materials. Government contracting officers use IGEs to negotiate prices and evaluate whether contractors have offered a "fair and reasonable" price. As their "independent" name implies, IGEs are created by the government, for the government's use, and they are not to be disclosed to contractors with whom the government is negotiating prices. As a government estimator, Keyes knew, based on common sense as well as on-the-job instruction and experience, that it was his responsibility to prepare the IGEs himself and keep them confidential.

**C. Defendant Leroy Weber**

Defendant Leroy Weber is an experienced contractor. Starting in 2001, Weber and his company, Webco Construction, Inc., participated in the Small Business Administration's 8(a) Business Development program. The 8(a) program provides mentorship, consulting, and training services to small businesses owned by members of disadvantaged socio-economic groups. Businesses certified by the program are exempt from competitive bidding on government contracts that fall below a certain dollar

threshold. After a certain period of time, businesses "graduate" from the 8(a) program and are no longer eligible to receive contracts under it. Through the 8(a) program, Webco performed over $30 million in government contracts between 2001 and 2011, including projects at the Depot and other military facilities. As part of the 8(a) program, Weber also received training on government contracting procedures.

By 2012, Webco had graduated from the 8(a) program. So Webco was not eligible to receive the Depot construction projects at issue here, since those projects were reserved as "sole source" contracts for active 8(a) firms. Using Weber's relationships in the construction industry, however, Weber and Keyes steered the Depot projects to 8(a) prime contractors that were aligned with Weber. These prime contractors were J. Davis, RMC, Bishop, Cherokee Nation, Alacran, and Whitehorn.

**D. Charged Conspiracy to Defraud the U.S.**

The evidence will show that Keyes and Weber agreed to defraud the United States by deceitfully obstructing the Depot's lawful contracting function and by cheating the government out of money and property. Instead of creating IGEs as he should have, Keyes secretly agreed to let Weber and his Webco employees make Keyes's IGEs for him. Keyes then gave the IGEs to government contracting officers at GSA, fraudulently and falsely representing that the IGEs were his own and failing to disclose that Webco had, in fact, created them.

Meanwhile, Weber and his Webco employees directed the 8(a) prime contractors to offer prices that were just under, and in some instances identical to, the IGE price. For many projects, Webco employees prepared the contractors' paperwork, sometimes cutting and pasting the prices from the IGEs directly into the forms used by the contractors to submit proposed prices to GSA. By offering prices that were close to or under the IGE price, Weber and his employees ensured that GSA would likely accept the offer. Weber then arranged for the 8(a) prime contractors to hire Webco as a subcontractor on the fraudulently obtained Depot contracts and pay Webco various subcontractor and contract management fees.

The GSA contracting officers, relying on the fraudulent IGEs created by Webco and not Keyes, negotiated sole-source contracts with the 8(a) prime contractors. In their negotiations, the contracting officers compared prices contained in the fraudulent IGEs to prices offered by the contractors to

determine whether the offered price was fair and reasonable. The IGEs were particularly critical to these sole-source contract negotiations, as there was no competitive bidding process allowing the government to comparison shop across multiple quotes. The contracting officers ultimately awarded the sole-source contracts, unaware the IGEs were fraudulent, unaware the contractors knew the IGE price and used those prices to prepare offers, and unaware of Weber's involvement in creating the IGEs.

Keyes and Weber deceived the GSA contracting officers into participating in a fraudulent contract negotiation. They deceived GSA into awarding and ultimately paying over $25 million in construction contracts. The 8(a) prime contractors, in turn, paid Weber and his companies over $5 million in subcontracting and contract management fees. And finally, Weber paid Keyes $10,000 and gave Keyes's daughter—at the time, a college student living in Oregon—a $12,000 job.

## III. EVIDENCE

### A. Witnesses

The United States expects to call approximately a dozen witnesses in its case in chief. In the absence of stipulations or pre-trial rulings on the authenticity and admissibility of certain documents, the United States may call additional document-custodian witnesses. Below, the United States provides a preview of some of the non-document-custodian witnesses. These summaries are intended to give a general outline of testimony and do not include every fact or topic to which the witnesses will testify:

Government Employees. **Tracy Maes** is a contracting officer with GSA (General Services Administration) in Denver, Colorado. Maes will testify that she was deceived and misled into believing that Keyes made the government's IGEs and that she was deceived and misled into negotiating the Depot contracts using IGEs she believed were confidential (when, in fact, they were not). She will testify that she eventually came to suspect that Keyes had not made the IGEs and ultimately reported Keyes to law enforcement. In addition to Maes, the government expects to call **Tracy Marino**, a Sierra Army Depot contracting officer who worked with Keyes at the Depot and will describe Keyes's job as an estimator, and **Glen Constantino**, a former employee of the SBA (Small Business Administration) who is familiar with the SBA's 8(a) program and will testify about Webco's participation in that program.

//

Former Webco Employees. The government expects to call four former Webco employees who were working for Webco in 2012. **Dave Burnach** was a Webco project manager who worked on-site at the Depot overseeing the construction jobs. He is expected to testify about Webco's role in making IGEs that Keyes later fraudulently and falsely represented as his own. He will also testify about assisting the 8(a) prime contractors to prepare their proposed prices based on the fraudulently created IGEs. **Cheryl Keohen** was a Webco employee working in Webco's office in Oxnard, California, north of Los Angeles. She will also testify about Webco's role in preparing fraudulent IGEs and the prime contractors' proposed prices. **Paige Harmon** and **Roberta Mansfield** also worked for Webco in its Oxnard office. Harmon will testify about Weber's hiring of Keyes's daughter, and Mansfield will testify about money Webco made on the Depot projects as a subcontractor.

Law Enforcement Agents. **Assistant Special Agent In-Charge Tracey Lilley** will testify about statements the defendants made to her. Agent Lilley is currently with GSA OIG (General Services Administration, Office of Inspector General) and was previously with DCIS (Defense Criminal Investigative Service). The parties have previously litigated, and the Court has previously ruled on, the admissibility of the defendants' statements in light of potential *Bruton* issues. (See below under "Evidentiary Issues" for a summary of the Court's rulings). Agent Lilley will also testify about documents Weber produced in response to grand jury subpoenas served on his companies. **Special Agents James McEdwards** and **Troy Andrade**, both with Army CID (Criminal Investigation Command), will testify about a post-indictment search executed on Weber's storage unit and the hard copy and electronic materials recovered from the search, including a December 2011 voicemail from Keyes to Weber. **Special Agent Derrick Lee**, also with Army CID, will testify about the $10,000 check Weber wrote to Keyes and how Keyes deposited and spent that check.

Miscellaneous Witnesses. **John Baily**, CEO of Tigua Enterprises, which in 2012 was an 8(a) company, will testify that Weber and Keyes tried unsuccessfully to recruit him to be a prime contractor on the Depot construction projects.

**B.     Documents**

The United States will introduce GSA contracting records and emails, Sierra Army Depot records, Webco documents and emails, SBA records reflecting Webco's participation in the 8(a)

program, and financial records including bank statements, tax returns, invoices, and checks. Some of these document categories are described further below:

GSA Business Records. GSA records include the contracts, award and payment documentation, "price negotiation memoranda" written by the contracting officers, and the IGEs provided by Keyes. The GSA records also contain emails among GSA officials, Keyes, and 8(a) prime contractors.

Webco Records. Records from Webco include emails between Keyes and Weber communicating about construction projects at the Sierra Army Depot and the creation of IGEs. The records also contain emails from Weber's employees updating him on the creation of IGEs and their transmittal to Keyes, the status of the construction projects at the Depot, and how much Webco was making as a subcontractor on the Depot projects. Additionally, the Webco records contain a voicemail message Keyes left for Weber discussing the initial stages of the conspiracy.

Financial Records. The United States intends to introduce financial records to show the $10,000 check Keyes received from Weber, the $12,000 Weber paid to Keyes's daughter, and the over $5 million Weber received as a result of the conspiracy.

## IV. SUBSTANTIVE LAW

### A. 18 U.S.C. Section 371

The general conspiracy statute, 18 U.S.C. section 371, states:

> If two or more persons conspire **either** to commit any offense against the United States, **or** to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

(emphasis added). Written in the disjunctive, section 371 sets out two distinct clauses: (1) conspiracy to commit a specific offense against the United States and (2) conspiracy to defraud the United States. The indictment charges Keyes and Weber with the second, "defraud" clause—conspiring to defraud the United States Department of the Army.

Because section 371 sets out two different clauses, a conspiracy to defraud the United States need not involve a conspiracy to commit another offense. *See United States v. Tuohey*, 867 F.2d 534, 538 (9th Cir. 1989) ("error . . . to assume that a section 371 conviction [for defrauding the United States]

requires a conspiracy to commit a another crime[,] [r]ather, the statue is self-contained; the conspiracy *is* the crime") (emphasis in original); *United States v. Khalife*, 106 F.3d 1300, 1303-04 (6th Cir. 1997) ("there is no 'substantive offense' underlying a § 371 conspiracy to defraud"); *United States v. Rosengarten*, 857 F.2d 76, 78 (2d Cir. 1988) ("conspiracies to defraud need not involve the violation of a separate statute").

"To conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924). Proof that the United States has been defrauded under section 371 does not require a showing of loss of money or property, nor does it require proof of detrimental reliance by the government. *See United States v. Caldwell*, 989 F.2d 1056, 1058-59 (9th Cir. 1993). Neither the conspiracy's goal nor the means used to achieve it need to be independently illegal. *See id.*

**B. Elements of Conspiracy to Defraud the U.S.**

The elements of a section 371 conspiracy to defraud the United States are:

- First, there was an agreement between two or more persons to defraud the United States. "Defraud the United States" means to cheat the United States government or any of its agencies out of money or property. It also means to obstruct or interfere with one of the United States government's lawful functions by deceit, craft, trickery, or dishonest means.
- Second, the defendant became a member of the agreement or conspiracy knowing of its objective to defraud the United States and intending to join together with at least one other conspirator to achieve that objective.
- Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy, with all the jurors agreeing on a particular overt act that the jury finds was committed.

*See* Ninth Circuit Model Criminal Jury Instructions § 8.21; Third Circuit Model Criminal Jury Instructions § 6.18.371B; *Hammerschmidt*, 265 U.S. at 188.

Under these elements, the government must show that conspirators have an agreed upon objective to defraud the government, whether by cheating it out of money or property or by obstructing a

federal government function, or both. *See United States v. Krasovich*, 819 F.2d 253, 254 (9th Cir. 1987) (overturning section 371 conspiracy-to-defraud conviction where evidence was insufficient to show that defendant "intended or agreed with anyone else to impede the [IRS] in its collection of taxes"). Yet, a single section 371 conspiracy, like any conspiracy, can have multiple objects, and the objective to impede the government "need not be the sole or even a major objective of the conspiracy." *United States v. Gricco*, 277 F.3d 339, 348-50 (3d Cir. 2002) (affirming a section 371 conspiracy-to-defraud conviction where evidence was sufficient to show that defendant not merely "fores[aw]," but also "desire[d]" and "specifically intended," result that conspirators not report their illegal income to the IRS).

Moreover, like any conspiracy, a 371 conspiracy to defraud can be proved through circumstantial evidence. Agreement can be inferred from a "concert of action" and "may exist by tacit agreement; an express or explicit agreement is not required." *United States v. Mann*, 161 F.3d 840, 847, 851 (5th Cir. 1998) (finding evidence sufficient to support conviction for conspiracy to, among other objectives, defraud the United States by impeding, impairing, obstructing, and defeating the lawful government functions of the Federal Home Loan Bank Board and the IRS).

Receipt of consideration and expectation of benefit are *not* required elements of a section 371 conspiracy to defraud. *See United States v. Peltz*, 433 F.2d 48, 52 (2d Cir. 1970) (explaining that neither "pecuniary loss" nor "receipt of consideration" are essential elements of a section 371 conspiracy-to-defraud charge: "[t]he very making of a plan whereby a government employee will divulge material information which he knows he should not is 'dishonest' within Chief Justice Taft's language in Hammerschmidt, regardless of whether such plan is secured by consideration"); *United States v. Shoup*, 608 F.2d 950, 957 (3d Cir. 1979) ("Although an anticipated benefit may be evidence of an alleged conspirator's mens rea, we agree with the Ninth Circuit that benefit, or a 'stake in the venture,' is not an element of s 371"). While not a required element, the government will, nevertheless, offer evidence of payments from Weber to Keyes and Keyes's daughter. This payment evidence is relevant to show the existence of an agreement between Weber and Keyes to defraud the United States, to show that both defendants became members of the conspiracy, to show an overt act in furtherance of the conspiracy, and to show motive.

**C. Conspiracies to Defraud the U.S. in Its Awarding of Federal Contracts**

Courts have held that conspiring to defraud the United States in the awarding of federal contracts can support a conviction under section 371. *United States v. Lane*, 765 F.2d 1376, 1380 (9th Cir. 1985) ("Involvement in a scheme for financial quid pro quos in federally financed contracts or to receive unjust enrichment charges a violation of [section] 371"); *United States v. Blanchet*, 518 Fed.Appx. 932, 934 (11th Cir. 2013) (conspiracy to obtain federal small business, set-aside contract for which company was ineligible violated section 371); *Shoup*, 608 F.2d at 959 (scheme to interfere with U.S. Attorney Office's expert-witness contract deprived government of "impartial evaluation" for which it had "bargained" and violated section 371).

Courts, moreover, have found that submitting false documents and divulging confidential government information to co-conspirators are acts of deceit that can form the basis of a section 371 charge. *See Haas v. Henkel*, 216 U.S. 462, 477 (1910) (conspiring with government employee to leak crop report information so that conspirators could speculate in the cotton market violated section 371); *United States v. Conti*, 804 F.3d 977, 979 (9th Cir. 2015) (conspiring to steal millions of dollars in federal grant funding by fabricating invoices billed to the government violated section 371); *United States v. Rodman*, 776 F.3d 638, 640 (9th Cir. 2015) (conspiring to transfer machine guns by submitting fraudulent firearm-transfer forms to federal ATF agency violated section 371); *Peltz*, 433 F.2d at 51-52 (conspiring with SEC employee to obtain confidential SEC information and trade on it for private profit violated section 371).

This case is comparable to these prior cases. Here, Keyes secretly and fraudulently let Weber and Weber's employees make IGEs, and in exchange, Weber paid Keyes money and gave his daughter a job. Keyes and Weber deceived GSA contracting officers into believing Keyes had created the IGEs, and they deceived those officers into awarding over $25 million in federal construction contracts. In this way, Keyes and Weber obstructed the government's lawful function to award contracts through a fair and honest negotiation process and cheated the government out of its money and property. This conspiracy defrauded the United States and is a violation of section 371's defraud clause.

## V. EVIDENTIARY ISSUES

The United States expects to file motions in limine asking the Court to rule on various evidentiary issues, including, for example, the authenticity and admissibility of business records, the authenticity and admissibility of electronic evidence seized from Weber's storage unit, Federal Rule of Evidence 404(b), and summary charts. In addition, the government expects the following issues to be raised during trial.

### A. *Bruton* and the Confrontation Clause

As mentioned above, Agent Lilley is expected to testify about statements both Keyes and Weber made to her. The Court has ruled on the admissibility of these co-defendant statements in light of potential Confrontation Clause issues. *See* Dkt. 92 (order); *see also* 67, 68, 71, 72, 86, 91, 94 (parties' briefs). In summary, the Court denied Keyes's motion to sever and granted in part and denied in part the United States' motion in limine to admit certain of Weber's statements. *See* Dkt. 92. Later, the United States told the Court and parties that, while the Court would permit it, the United States does not intend to introduce the modified statements Weber made about hiring Keyes's daughter. *See* Dkt. 94.

In sum, Agent Lilley will testify about statements both Keyes and Weber made to her, but her testimony will be limited to statements that do not refer to the other co-defendant. The government will ask the Court to give the jury a limiting instruction that this testimony may be considered only for the purpose of determining the guilt or innocence of the respective defendant and not for any other purpose. If Weber testifies in his defense, then the government may call Agent Lilley to testify in its rebuttal case about Weber's statements that were subject to the *Bruton* motion.

### B. Jencks Act and Use of Agent Summary Reports

The United States has made extensive pre-trial disclosure of summary reports prepared by agents of witness interviews. Under the Jencks Act, a "statement" is defined as "a written statement made by said witness and signed or otherwise adopted and approved by him;" a recording or transcription that is "a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously;" or a statement made by a witness to the grand jury, however taken or recorded. 18 U.S.C. § 3500(e).

Unless a witness reviews and adopts an agent's interview summary—which was not the practice in this investigation—the interview reports are not statements of the witness under the Jencks Act. Moreover, because agents wrote reports after interviews, incorporated their own interpretations, and summarized the information provided, the reports are not contemporary and substantially verbatim recitals of witness' oral statements. While defense counsel may ask witnesses about statements made to agents, the Court should not allow counsel to publish the contents of the agent's reports, or otherwise suggest that the *agent's* interview reports are the *witness's* own statements. The defense should also be precluded from introducing as an exhibit the contents of the agents' interview reports to impeach witnesses because of any alleged inconsistent statements.

**C. Juror Handwriting Comparison**

Some of the documents in this case contain various handwriting and signatures. Some handwriting and signatures will be identified through witnesses or stipulations with the defense. Where handwriting is unidentified, however, the law on handwriting comparison is well-settled—the jury itself may make their own comparisons. *See United States v. Alvarez-Farfan*, 338 F.3d 1043, 1045 (9th Cir. 2003). "In the absence of extreme or unusual circumstances . . . we see no reason why handwriting comparisons cannot be made by jurors, and conclusions drawn from them, either in the presence or absence of expert opinion." *United States v. Woodson*, 526 F.2d 550, 551 (9th Cir. 1975); *see also United States v. Jenkins*, 785 F.2d 1387, 1395 (9th Cir. 1986) (holding that "[e]xtreme or unusual circumstances involve situations where the authenticity of the handwriting is the primary issue in the case, as where forgery is alleged").

**D. Non-Prosecution and Cooperation Agreement**

Dave Burnach, a former employee of Webco as described above, is expected to testify pursuant to a non-prosecution and cooperation agreement he entered into with the United States. During direct examination, the government may elicit evidence of Burnach's cooperation agreement. The Ninth Circuit has recognized that preemptive introduction of such evidence is proper, and the government need not wait for the defense to first attack the witness's credibility. *See United States v. Halbert*, 640 F.2d 1000, 1004 (9th Cir. 1981) (guilty plea evidence "may be elicited by the prosecutor on direct examination so that the jury may assess the credibility of the witnesses the government asks them to

believe"); *United States v. Anderson*, 532 F.2d 1218, 1230 (9th Cir. 1976) (preventing prosecutorial questioning on direct about a codefendant's guilty plea creates a false impression with the jury of prosecutorial concealment).

While the government may elicit on direct examination testimony about a cooperator's agreement with the government, it may not elicit testimony or introduce evidence concerning portions of an agreement that could bolster a witness's credibility, unless the defense has attacked it. If the defense challenges a witness's veracity, either on cross examination or as early as opening statements, the government may rehabilitate the witness with reference to the truthful testimony provision in the agreement. This reference is not improper vouching. *See United States v. Monroe*, 943 F.2d 1007, 1013-14 (9th Cir. 1991); *United States v. Necoechea*, 986 F.2d 1273, 1277-79 (9th Cir. 1993).

**E. Exclusion of Witnesses**

The United States will move for an exclusion of all witnesses until their testimony has been completed, pursuant to Federal Rule of Evidence 615. The United States will further move that GSA-OIG agents Tracey Lilley and Sean Gomez and Army CID agents Christopher Nelson and Derrick Lee be designated as case agents and thus be exempt from the exclusion order, pursuant to Rule 615(b); *see also United States v. Little*, 753 F.2d 1420, 1441 (9th Cir. 1984) (exempting IRS case agent from witness exclusion order). In addition, the United States anticipates that Department of Justice Paralegal Specialist Rachel Evans will be present at counsel table throughout trial to aid in the organization and presentation of exhibits.

Respectfully submitted,

Dated: May 3, 2021

By: */s/ Jacklin Chou Lem*
JACKLIN CHOU LEM
Trial Attorney
Department of Justice
Antitrust Division